# HUGHES *et al.* v. BOARD OF COM'RS OF OKLAHOMA COUNTY.

### No. 3989.    June 8, 1915.

### Rehearing Denied August 3, 1915.

### (105 Pac. 1029.)

1. **CLERKS OF COURTS—Compensation—Statutes.** Section 828, c. 16, tit. "Judiciary," Rev. St. U. S. (U. S. Comp. St. 1913, sec. 1383), relating to the fees and compensation of clerks of the district court of Oklahoma Territory, by virtue of section 13 of the Organic Act. (Rev. Laws 1910, vol. 1, p. lviii), is inconsistent and repugnant to the Constitution, and is locally inapplicable, and was therefore not extended to 'and did not remain in force by reason of, section 2, art. 25, of the Schedule to the .Constitution, in the State of Oklahoma after the adoption of the Constitution.

2. **OFFICERS—Change of Compensation—Validity of Statute.** There being no provision of the statutes or the Constitution fixing the compensation for the several clerks of the district courts prior to the passage of the act by the special or extraordinary session of the Legislature on March 19, 1910 (Sess. Laws 1910, c. 69, pp. 129, 139), the action of said Legislature in fixing the compensation of such officers is not in conflict with Const. art. 23, sec. 10, forbidding the enactment of a law diminishing or increasing the emoluments or salary of a public officer after his election or appointment or during his term of office.

3. **CLERKS OF COURTS—Compensation—Fee and Salary Act— Time of Taking Effect.** The fee and salary act (Laws 1910, c. 69), passed by the Legislature March 19, 1910, without the emergency clause, wherein the salaries of the various county officers were based, for the respective counties, on the population thereof, to be determined by the federal census of April 15, 1910, went into effect and became operative as to clerks of the district courts on June 17, 1910, by virtue of section 58, art. 5, Constitution, regardless of the fact that on that date the census showing the population of such counties had not been officially promulgated by the federal officers.

4. **SAME—Counties—Compensation—Per Diem Fee—Recovery of Payment.** The federal fee bill, in force in Oklahoma Territory prior to statehood, not having been continued in force by section 2, Schedule, Const. (section 366, Williams' Ann. Const.), there was no law authorizing clerks of the district courts of the state of Oklahoma to claim or receive a **per diem** fee of $5 per day for attending

sessions of the court. And, where such claims have been made to and paid by the board of county commissioners, the same may be recovered back from such clerk receiving them.

5. **COUNTIES — Officers — Compensation — Recovery.** A board of county commissioners is without jurisdiction to allow a claim of a county officer for salary, fees, or other compensation not authorized by law; and an officer who receives such sums from the county treasurer, not being entitled thereto, is liable therefor at the suit of the county, regardless of the fact that no appeal has been taken from the action of the board allowing same.

6. **APPEAL AND ERROR—Harmless Error—Admission of Evidence.** In a suit on an official bond, where a full and complete copy thereof is attached to and made a part of the petition, which avers the execution and obligation of the bond, and the breach thereof, and where the answer is unverified, and pleads special defenses, in which the execution of the bond is admitted, and where the case is tried to the court on an agreed statement of facts, in which it is agreed that defendant executed a bond and it was filed and approved on the date shown by the exhibit, and where the case was tried and determined in the light of the terms of the bond, and the parties and court treated it as in evidence, the fact that it was not formally introduced in evidence is immaterial and harmless.

7. **OFFICERS—Official Bond—Change in Powers and Duties.** In the execution of an official bond of a county officer, it is within the contemplation of the parties that the Legislature has the power to change, add to, or modify the powers and duties of such officer from time to time and as may be thought necessary; and therefore, where a law is passed placing a clerk of a court on a salary, and requiring him to account for certain fees, where theretofore his compensation had been on a fee basis, such change and added powers and duties, being germane and appropriate to his office, will not have the effect of discharging his bond from liability.

8. **CLERKS OF COURTS—Officers—Official Bond—Liability.** Sureties on an official bond are only answerable for the acts of their principal, while engaged in the performance of some duty imposed by law, or for an omission to perform such duty; and therefore the bond of a court clerk is liable for all moneys coming into his hands as such clerk under the law and by virtue of his office and unaccounted for by him.

9. **OFFICERS—Official Bond—Liability of Sureties.** To constitute color of office, such as will render an officer's sureties liable for his wrongful acts, something else must be shown besides the fact that in doing the act complained of the officer claimed to be acting in an official capacity.

10. **CLERKS OF COURTS—Official Bond—Liability of Sureties— Extent.** Sums paid illegally and without authority or warrant of

Hughes et al. v. Board of Com'rs of Oklahoma County.

law to a court clerk by the board of county commisioners, who are themselves charged with the duty of administering the county business and protecting its finances, are not within the obligation of his bond as sums properly coming into his hands by virtue of his office. .

11. **SAME—Liability—Deposits for Costs.** Deposits made in court cases, in accordance with the law, to secure court costs, which, as earned, belong to the county, are sums coming into the hands of the clerk by virtue of his office, and his bond is liable upon his failure to pay them to such party as may be entitled to receive them.

12. **SAME—Liability for Fees.** Sheriff's fees and so-called stenographer's fees coming into the hands of the clerk in cases in the court he serves, and which fees belong wholly or in part to the county, are sums received by virtue of his office.

(Syllabus by Brewer, C.)

*Error from District Court, Oklahoma County;*
*W. R. Taylor, Judge.*

Action by the Board of County Commissioners of Oklahoma County against W. C. Hughes and another. Judgment for plaintiff, and defendants bring error. Modified and affirmed.

*J. H. Huckleberry, Stuart, Cruce & Gilbert,* and *Arthur G. Moseley,* for plaintiffs in error.

*C. W. Stringer* and *Sam Hooker,* for defendant in error.

Opinion by BREWER, C. The board of county commissioners of Oklahoma county brought this suit against W. C. Hughes, who served said county as clerk of the superior court from June 28, 1909, to January 9, 1911, and the Southern Surety Company, surety on his official bond, for the purpose of recovering certain fees and emoluments received by him in excess of the compensation to which he was justly entitled; for certain deposits in his hands when he went out of office, which should have been turned over to his successor; and for certain fees and

fines, collected by him and not turned into the county treasury, etc. The cause was tried, by agreement of parties, by the court upon an agreed statement of facts, upon which the court gave judgment against defendant Hughes for $10,087.25 and against the surety company for the sum of $10,000; the same being the extent of the obligation of its bond.

Inasmuch as the surety company raises different questions relative to the different items entering into the judgment, we find it expedient to analyze the statement of facts and findings of the court based thereon, and to set out and classify the items entering into the judgment, as follows: (1) $4,438.95, in the hands of the clerk when he went out of office, same being deposited by various litigants in various causes, out of which costs, witness fees, etc., were to be paid as earned, and which ought to have been turned over to his successor; (2) $21.65, erroneously allowed the clerk by the county on claims filed; (3) $1,607.90, criminal fees allowed and paid the clerk by the county after June 17, 1910; (4) $196.12, excess of civil fees collected after June 17, 1910, above the salary for himself and assistants allowed by the act of the Legislature of that date; (5) $1,598.33, charged and collected as criminal fees, fines, and as sheriff and stenographer's fees in excess of the sum turned over to the county; (6) $47.50, allowed by the county for expenses of operating office prior to June 17, 1910; (7) $1,521.80, paid him by the county as *per diem* fees of $5 per day for attending court prior to June 17, 1910; (8) $655, paid him by the county as such *per diem* fees after June 17, 1910. The total of the items, as enumerated above, aggregates the sum of $10,087.25, the amount of the judgment against the principal defendant.

As to defendant Hughes, it may be said that his defenses are quite similar, if not identical, with those set out in the case of *Hathaway Harper v. Board of County Commissioners of Oklahoma County*, 149 Pac. 1102, 154 Pac. 529, handed down with this opinion (modified on rehearing January 11, 1916), not yet officially reported. These defenses, generally and briefly stated, are to the effect that, under the act creating superior courts and providing for each a clerk (Sess. Laws 1909, p. 181), it was provided that his compensation should be the same as that of clerks of the district courts, and that the clerks of the district courts were allowed certain fees and emoluments, under the federal fee bill, in force after statehood; that he was therefore entitled to all fees taxed under such fee bill that came into his hands, including the *per diem* fee of $5 per day for attending court; and, further, that inasmuch as he was holding office, with fixed fees and emoluments appertaining thereto, at the date the fee and salary act was passed by the Legislature and approved by the Governor on March 19, 1910, without the emergency clause, which went into effect June 17, 1910, and which provided for a salary for the clerks of the superior courts and certain assistants, said act was not applicable nor operative as to him, because it would change the compensation allowed him by law during his term of office, contrary to section 10. art, 23, of the Constitution; and that therefore he was entitled to all the civil fees coming into his office, and to charge and collect from the county criminal fees during the entire term he was in office. We do not understand that he contends that he has any right to retain the court deposits and the criminal fees and fines collected by him from criminals, and the fees taxed as sheriff and stenographer's fees, which

came into his possession; and as to the defenses he does make it is sufficient to say that none of his contentions are sound, as we think is clearly shown by the Harper Case, *supra*. The holding in the Harper Case, briefly stated, is that the office of clerk of the district court was created by section 2, art. 17, of the Constitution; that the federal fee bill, in force in Oklahoma Territory, as shown by section 13 of the Organic Act (Wilson's Rev. & Ann. Stat. 1903, sec. 73) and chapter 16, tit. "Judiciary," sec. 828, Rev. St. U. S. (Comp. St. U. S. 1913, sec. 1383), was not brought over and put in force by the Constitution, because of inconsistency, repugnancy, and local inapplicability; that, there being no law in force after statehood prescribing salary or other compensation for clerks of the district courts prior thereto, the act of the Legislature approved March 19, 1910, without the emergency clause, was effective and operative as to such clerks, and in no wise infringed upon section 10, art. 23, Constitution, relative to changing the salary of an officer during his term; that said act, being a non-emergency act, went into effect on June 17, 1910, under section 58, art. 5, Constitution, and this notwithstanding the fees and salaries provided for were based, for the different counties, on the federal census of 1910, which on that date had not been officially promulgated; that the *per diem* fees of $5 claimed and the sums allowed for office expense were illegal and without authority of law, and, if allowed and paid by the county, could be recovered, notwithstanding no appeal had been taken from its allowance. The Harper Case disposes of all the defenses possible to the defendant Hughes in the suit against him. Therefore the judgment was correct as to all the items composing it.

2. We will consider whether or not the defendant Southern Surety Company is liable as surety on the official bond of its codefendant, Hughes, and the extent of that liability, if any attaches. This bond is in the sum of $10,000, and runs in the name of the county of Oklahoma as obligee, was properly executed by the company, and was filed and approved on June 28, 1909, the day upon which Hughes assumed the duties of the office of clerk of the superior court. The obligation of the bond is as follows:

"Now, if the said Wm. C. Hughes shall render a true account of his office and of the doings therein to the proper authority, when required thereby, or by law, and shall promptly pay over to the person or officer entitled thereto all money which may come into his hands by virtue of his said office, and shall faithfully [account] for all the balances of money remaining in his hands at the termination of his office, and shall hereafter exercise all reasonable diligence and care in the preservation and lawful disposal of all money, books, papers, and securities or other property appertaining to his said office, and deliver them to his successor, or to any person authorized to receive the same, and if he shall faithfully and impartially, without fear, favor, fraud, or oppression, discharge all other duties now or hereafter required of his office by law, then this bond to be void; otherwise to remain in full force and effect."

The surety company presents argument in support of its contention of nonliability under the following general heads: (1) That the court cannot determine the obligation of the bond, or whether there has been a breach thereof, for the reason that the bond was not introduced in evidence; (2) that the passage of the fee and salary act of June 17, 1910, altered the terms of its contract and released it from liability; (3) that the unlawful sums

paid to Hughes by the county commissioners, to wit, *per diem* fees, overcharge, expenses of office, and fees in criminal cases, are not within the obligation of the bond; (4) that it is not liable for sheriff and stenographer's fees collected by Hughes; (5) that the terms and conditions of the bond are in excess of those required by statute, and are to that extent void; (6) that the board of county commissioners is not the proper party to sue for sheriff and stenographer's fees.

We will dispose of the contentions in the order named.

(1) A full and complete copy of the bond was attached to and made a part of the petition in this case, which contained proper allegations as to its execution, obligation, and breach. The answer filed in the case by this defendant is unverified, which, of itself, admits the execution of the bond as alleged, and set out as part of the petition. Section 4759, Rev. Laws 1910. Besides, the answer filed admits the execution of the bond by pleading that certain items sought to be recovered "are not such moneys as are covered by the obligation of the bond executed by this defendant," and by pleading further that the failure of the board of county commissioners to require a monthly accounting by the clerk has "released and discharged [it] of all liability by reason of the execution of said bond." In the agreed statement of facts, upon which the case was tried, it is agreed that the clerk executed a bond, with this defendant as surety; that it was duly filed on the 28th day of June, 1909; and that Hughes continued as clerk from that date until January 9, 1911. The execution of the bond was admitted; its obligation was fully set out, was treated by the parties as before the court, and in fact, under the state of the record,

it was before the court.   Therefore this contention is, without merit.  *Long v. Shepard,* 35 Okla. 489, 130 Pac. 131; *Tate v. Stone,* 35 Okla. 369, 130 Pac. 296; *Owen v. Southern Surety Co.,* 38 Okla. 124, 131 Pac. 1091; *Railway v. Wilson,* 10 Kan. 87; *Reed v. Arnold,* 10 Kan. 102; *Walker v. Fleming,* 37 Kan. 171, 14 Pac. 470; *Board of Education v. Shaw,* 15 Kan. 35.

(2)  It is contended that the passage of the fee and salary act increased the obligation of the bond, thus altering the contract, without the consent of the surety company, and that this discharged it from liability.  On this point we find a very learned and exhaustive discussion in the case of *People v. Vilas,* 36 N. Y. 459, 93 Am. Dec. 520, from which we quote the following:

"As between private parties, the law is that any alteration in the obligation or contract in respect of which a person has become surety without the consent of the latter extinguishes his obligation and discharges him (Burge on Surety, 214; Theobald on Principal and Surety, section 132; *Witcher v. Hall,* 5 Barn. & C. 269) ; and this result follows irrespective of the inquiry whether the alteration could work any injury to the surety or not (*Bangs v. Strong,* 4 N. Y. 315).  The reason upon which this rule is founded is that the surety has never made the contract upon which it is sought to charge him.  His answer is, if it is sought to charge him upon the altered contract, that he never made any such bargain; and if upon the original contract, that such contract no longer exists, having been legally terminated by the altered or substituted contract made by the parties.  In either contingency the answer furnishes a complete defense.

"It is claimed by the defendants that the same rule is applicable to official bonds.  In this they are right, if the reasons apply, and the same answers can be given.  An official bond is a contract with the people for the faithful discharge of the official duties of the officer.  In

the present case it was that Jackson should faithfully discharge the duties of said commissioner, pursuant to the act entitled 'An act authorizing a loan of certain moneys belonging to the United States, deposited with the State of New York for safe-keeping,' and should discharge his said duties without favor, malice, or partiality. These duties Jackson has not performed, but the sureties claim to be discharged, on the ground that, subsequent to the making of the bond, $500 was added to the capital of the fund. The duties of the commissioner as to this $500 were precisely the same as required for the capital of the fund, and precisely those required by the act referred to in the bond. The position of the defendants must go to the extent that any alteration made by the Legislature in the act affecting the duties of the commissioner will discharge his sureties; in other words, that the bond is to be regarded as a contract faithfully to discharge the duties of the office as then prescribed by the act, and that any alteration in these duties, made by the Legislature subsequently, alters the contract, and hence discharges the sureties. If this position be sound, it follows that no change can be made by the Legislature relative to the amount of money in their hands, the mode of loaning it, their compensation, or their duties in any respect without discharging their official bonds.

"It may be remarked that it would not only relieve the sureties upon the bond, but the officer himself, unless it should be held that his continuance in office after the passage of the act making the change was an assent on his part to such change. The analogy between this class of cases and the contracts of individuals fails in this respect. In the latter no alteration can be made without the mutual assent of both parties. In the former the Legislature have power at any and all times to change the duties of officers, and the continued existence of this power is known to the officer and his sureties, and the officer accepts the office and the sureties execute the bond with this knowledge. It is, I think, the same in effect as though this power was recited in the bond. Had this

been done, it would not be claimed that the sureties were discharged by its exercise. If an individual had given a guaranty of the faithful performance of a contract by one party containing a clause authorizing the other to make alterations in certain of its provisions, it would not be claimed that the surety was discharged by alterations so authorized; and yet this is nothing more than the sureties knew the Legislature were competent to do in the present case. Why has it never been claimed in behalf of officers who had given bonds for the discharge of their official duties that a contract had been made with them in relation thereto unchangeable by the Legislature? Simply because it is understood that all these acts are subordinate to the lawmaking power, and necessarily subject to such changes as may from time to time be deemed expedient. Every official oath is so interpreted. It is not true that one taking an oath to discharge the duties of any office simply swears to discharge them as then prescribed by law, but that he swears to discharge them as they may from time to time be fixed and regulated by the lawmaking power. So an official bond conditioned for the discharge of the duties of the office should in like manner be understood, not as restricted to duties as then prescribed by law, but as embracing the duties of the office as from time to time fixed and regulated by the Legislature.

"* * * In the absence of authority determining the question otherwise, my conviction is that any alteration, addition, or diminution of the duties of a public officer made by the Legislature does not discharge his official bond or the sureties thereon so long as the duties required are the appropriate functions of the particular officer; that all such alterations are within the contemplation of the parties executing the bond. * * *"

Another case which appears to be directly in point is that of *Snyder v. State*, 5 Wyo. 318, 40 Pac. 441, 63 Am. St. Rep. 60. In that case, after the election and qualification of the clerk, the Legislature passed a law

which, as here, changed the compensation of the clerk from that of fees to a fixed salary. We quote the following from that case:

"The argument is that the liability of the clerk was increased by the change in the law which requires him to account for the fees of the office, which were formerly his compensation. We cannot agree to the proposition that an increase in the responsibilities of the clerk in matters which properly pertain to his office has the effect to discharge his sureties from all liability upon his bond."

We also refer to the following authorities, which seem to be in point: *Norton v. Kumpe,* 121 Ala. 446, 25 South. 841; *Sacramento County v. Bird,* 31 Cal. 67; *Prickett v. People,* 88 Ill. 115; *White v. Fox,* 22 Me. 341; *Allegan v. Chaddock,* 119 Mich. 688, 78 N. W. 892; *Marney v. State,* 13 Mo. 7; *Board of Education v. Quick,* 99 N. Y. 138, 1 N. E. 533; *State v. Grizzard,* 117 N. C. 105, 23 S. E. 93; *Dawson v. State,* 38 Ohio St. 1; *Snyder v. State,* 5 Wyo. 318, 40 Pac. 441, 63 Am. St. Rep. 60; *Gausson v. U. S.,* 97 U. S. 584, 24 L. Ed. 1009.

From an examination of the above authorities, we think, as has been said in some of the cases, that the true rule is that sureties on official bonds are not discharged from liability by the passage of a statute changing the emoluments or powers of an office held by the principal, provided the new powers are appropriate to the office.

(3) Is the surety company on the official bond liable for the sums of money erroneously and illegally paid the principal in the bond by the county commissioners? These sums are: Criminal fees after July 17, 1910, $1,607.90; *per diem* fees for attending court, $2,176.80; expense of office, $47.50; overcharge, $21.65. These items aggregate the sum of $3,853.85. The surety company contends that

it is not liable for these sums, for the reason that the clerk had no authority to receive them, nor had the board of county comimssioners any authority to pay them to him; that is to say, said sums did not come into his hands by virtue of his office. It seems to us that the law as to what acts of commission or omission come within the obligation of an official bond is quite well settled in this state. As early as 1895, it was said by the territorial Supreme Court in *Dysart v. Lurty*, 3 Okla. 601, 41 Pac. 724:

"Where an officer, while doing an act within the limits of his official authority, exercises such authority improperly, or exceeds his official powers, or abuses an official discretion vested in him, he becomes liable on his official bond to the person injured. But where he acts without any process and without the authority of his office in doing such act, he is not to be considered an officer, but a personal trespasser. The weight of authority seems to support the doctrine that sureties on an official bond are only answerable for the acts of their principal while engaged in the performance of some duty imposed upon him by law, or for an omission to perform some such duty"—citing a long list of authorities.

That case presented an alleged wrongful performance of a ministerial duty, as against the bond of an executive officer, but there is no difference in principle, that we can see, in the obligation of such a bond and the one in question, and that case came under review shortly thereafter in *Lowe v. City of Guthrie*, 4 Okla. 287, 44 Pac. 198, which involved the obligation of the official bond of the city clerk. As here, that was a suit to recover for a large sum of money coming into the hands of the clerk and unaccounted for. In that case it was held:

"The statute requires the clerk to give a bond for the faithful discharge of the duties of his office. This com-

prehends every duty required of him by law or ordinance. It embraces the faithful accounting for, and payment to the city treasury of, all moneys that shall come into his hands by virtue of his office. And his sureties can only be held liable for a failure to faithfully discharge such duties, although the terms of the bond may be more comprehensive. Sureties on official bonds are liable only for acts of the principal done *virtute officii*, and not for acts done *colore officii.*"

The result was that the bond was exonerated from any liability on account of a large sum, representing license fees which came into the hands of the city clerk, but which he had not, under the law or ordinance of the city, the lawful right to receive. In the last-named case, which seems to be clearly in point here, it is said in the text:

"Sureties on an official bond are only answerable for the acts of their principal while engaged in the performance of some duty imposed by law or for an omission to perform such duty."

After the erection of the state and the organization of this court these cases came under review again in *Inman v. Sherrill et al.*, 29 Okla. 100, 116 Pac. 426, in which case it was held:

"Where an officer, while doing an act within the limits of his official authority, exercises such authority improperly, or exceeds his official powers, or abuses an official discretion vested in him, he becomes liable on his official bond to the person injured. But where he acts without any process and without the authority of his office in doing such act, he is not to be considered an officer, but a personal trespasser."

In passing upon the point and after noting the decisions in the Dysart and Lowe Cases, *supra,* the court applied the doctrine of *stare decisis.* Later the same doc-

trine was announced and applied in the case of *Jordan et al. v. Neer,* 34 Okla. 400, 125 Pac. 1117. A statement in the syllabus is as follows:

"To constitute color of office, such as will render an officer's sureties liable for his wrongful acts, something else must be shown besides the fact that in doing the act complained of the officer claimed to be acting in an official capacity."

Taking the doctrine of the cases noted as the settled rule in this state, it remains only to apply the rule to the facts before us. The clerk was not entitled to these sums; no authority of law can be found which authorizes him to claim or receive them. Likewise, and as a necessary sequence, the commissioners were without authority of law, power, or jurisdiction to pay them. Indeed, the very basis for the recovery of these sums against the principal, where no appeal was taken from their allowance, is the fact that the commissioners had exceeded their jurisdiction in allowing the claims. But it is said that the clerk received these sums by virtue of his office, because he had the lawful right to present his claims for compensation. It is granted that he had such right, but it by no means follows that because he had the right to claim lawful compensation, this right would embrace a claim for sums to which he was not entitled, and the payment of which to him would be in violation of law. Therefore we are fully convinced that in claiming and receiving from Oklahoma county these sums to which he was not entitled he was a mere trespasser, if such a term may properly be applied to this kind of conduct; in other words, these sums came into his hands in no sense *virtute officii,* and the most that can be said would be that they came into his hands *colore officii.* An

officer's bond was not intended to, and does not, cover all the things he may do or fail to' do while in office. Its purpose is to guarantee the officer's conduct and ' good faith in performing his official duties; and its obligation, as has been seen, extends only to such officer's sins of commission and omission in the performance of, or failure to perform, some duty of his office. It was not the duty of his office to get money illegally from the treasury of Oklahoma county, under the claim and guise of compensation. Besides, the board of county commissioners are, in a sense, managers and administrative agents of the county; they have charge of the expenditures of the county funds; it was their business to safeguard those funds and see that they were not paid out improperly to officers or anybody else who might see fit to make a claim. This loss has occurred, primarily, through their dereliction; it was their error. While the clerk participated to the extent of making the claims, the grievous fault was with the board of county commissioners in erroneously paying them. To extend the obligation of this bond to cover sums so paid seems to us too much like holding it for the default of other officers, for whom the sureties had no intention to become surety. Therefore it seems quite clear to us that the items under discussion are not covered by the obligation of the bond.

(4) Defendant is in error in the contention that it is not liable for the fees coming into the hands of the clerk designated as sheriff and stenographer's fees, and which he failed to pay over. The stenographer's fees were collected under section 1937, Comp. Laws 1909, requiring their collection in certain cases; and, while they are termed "stenographer's fees," they were to be turned into the county treasury, the stenographer receiving his com-

pensation on claims filed and warrants allowed, regardless of whether or not there were sufficient fees from this source to meet the claims. As to the sheriff's fees, the county had an interest in them, and they had to be reported by the sheriff; and, while it is true the sheriff had a right to retain a certain portion of them for his compensation, the remainder belonged to the county, and came into the hands of the clerk in cases in the court which he served in the regular and ordinary dispatch of its business. We think these sums were beyond question properly included in the judgment against the bond.

(5) Nor do we think that there is any merit in the contention that the terms and conditions of the bond are in excess of those required by statute, and are to that extent void. Section 1972, Comp. Laws 1909, which was a part of the act creating superior courts, provides, in relation to the clerks of such courts, that "he shall give bond for the faithful performance of his duties as required of the clerk of the district court." The point made is that at the time of the passage of that act there was no law requiring a bond for the clerks of the district courts, and that therefore the conditions of the present obligations are in excess of that required by law. Confessedly, the statute requiring the clerks of superior courts to give bond furnishes authority and requirement that its obligation should be "for the faithful performance of his duty," and this independent of whether or not the clerks of the district courts were required to give bond. This obligation is quite extensive of itself; and we have no doubt but that it is sufficiently so to cover all the actions of the clerk for which the bond is held liable in this case. Apart from that—and we have not examined the authorities on the point—it was good as a

common-law bond. It was entered into voluntarily, without fraud, oppression, or coercion; is not *malum in se;* is supported by a valid consideration; and is not inconsistent with the public policy or laws of this state. Indeed, the giving of a bond by this officer is not only consistent with, but is required by, the very law creating the office.

In the case of *Ahsmuhs v. Bowyer et al.,* 39 Okla. 376, 135 Pac. 413, 50 L. R. A. (N. S.) 1060, which was a suit against the surety on the offiical bond of the clerk of the district court of Major county, given admittedly at a time when there was no law requiring it, this court, speaking through Mr. Justice Sharp, said:

"A bond voluntarily given by a district court clerk, prior to the passage of the act of March 19, 1910 (Sess. Laws 1910, p. 129), naming the State of Oklahoma as obligee, conditioned for the faithful performance of his official acts, and for the accounting and paying over of all moneys by him received as such officer, is a valid and binding obligation, though not required to be given by statute, where supported by a valid consideration."

(6) Something was said in the oral argument of this case relative to the right of the board of county commissioners to sue for and recover the deposits made by litigants with the clerk to cover court costs and witness fees, etc., to be earned in various cases, and which it was the duty of the clerk to turn over to his successor in office. This question was made by one of the judges; for, upon an examination of the brief filed by the surety company, it is admitted that, if its general legal contentions should not be sustained, it is liable for the sums under discussion. On page 10 of the brief it is said:

"On the facts, and if not sustained in any of its legal contentions as hereinafter set forth, the contention of

Southern Surety Company is that it may be charged, under section 3, with $4,438.95; under sections 7 and 8, stenographer's fees, $389.95; criminal fees, etc., $314.56 —total, $5,143.36."

Its legal contentions regarding general nonliability of the bond having been overruled, its admission justifies the incorporation of these sums in the judgment here. Were this not so, the writer of this opinion, who raised the question at the hearing, has, upon mature reflections, become convinced that the admission of counsel is fully justified; that the sums in question came into the hands of the clerk by virtue of his office and of the law (section 5222, Rev. Laws 1910); that they are recoverable against the bond; and that the county has an interest in and may, through its county commissioners, maintain the suit. Further, there was no suggestion of defect of or improper parties in the trial court, where such questions should have been raised.

This leads us to conclude, upon the whole case, as against the Southern Surety Company, that the judgment against it for the sum of $10,000 should be credited with the sum of $3,853.85, and that the judgment, so corrected, should be affirmed.

By the Court: It is so ordered.